IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DESHAWN DRUMGO, )
)
Plaintiff, )
)
v. ) Civ. Action No. 14-1136-GMS
)
MIKE LITTLE, et al., )
)
Defendants. )

### MEMORANDUM

The plaintiff, DeShawn Drumgo ("Drumgo"), an inmate at the James T. Vaughn

Correctional Center ("VCC"), Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C.

§ 1983.[1]  (D.I. 3.) He appears *pro se* and was granted permission to proceed *in forma pauperis*.

(D.I. 6.)  Pending before the court is the defendants' motion for summary judgment.  (D.I. 45.)

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleges violations of the First, Sixth, Eighth, and Fourteenth Amendments

to the United States Constitution.  (D.I. 3.)  On November 24, 2014, the court screened the

complaint and allowed Drumgo proceed on:  (1) claim two, retaliation claims against the

defendants C/O Roy Foraker ("Foraker"), Sgt. Patrick Iwaskiewicz ("Iwaskiewicz"), Tim Martin

("Martin"), and Mike Little ("Little"); (2) claim three, excessive force claim against Lt.

Stevenson ("Stevenson") and failure to intervene claim against and C/O Timothy Moss

("Moss"); and (3) claim five, excessive force and retaliation claims against C/O Kirlin ("Kirlin")

---

[1]When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

and C/O Shannon Corbett ("Corbett"). All other remaining claims and defendants were dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(i) and (ii) and 1915A(b)(1).

### A.     Allegations in the Complaint

#### 1.     Claim 2, Retaliation against Foraker, Iwaskiewicz, Martin, and Little

Drumgo alleges that on February 11, 2014, Foraker, Iwaskiewicz, Martin, and Little took actions concerning Drumgo's confidential materials to teach Drumgo a lesson for filing civil complaints and grievances. Drumgo alleges that after he saw his attorney on February 11, 2014, Foraker, Iwaskiewicz, and Martin showed Drumgo copies of his confidential materials. Drumgo alleges that Iwaskiewicz passed the documents to Foraker who passed them to Martin, who them brandished them in front of Drumgo. Drumgo was able to get glimpses of the documents. Drumgo alleges that Iwaskiewicz told him that Little was trying to teach Drumgo a lesson for filing civil complaints and grievances.

#### 2.     Claim 3, Excessive Force against Stevenson and Failure to Intervene against Moss

Drumgo alleges that on April 5 or 6, 2014, when he was transferred to Building #21, Iwaskiewicz and Stevenson refused to honor a memo from Major Costello that allowed Drumgo's legal work to follow him to isolation. Drumgo asked Moss for his documents, to no avail. When Drumgo refused to walk, he was loaded onto a food cart and taken to the infirmary for review of injuries. Drumgo alleges that Moss and Stevenson were angry that he would not walk so they dragged him by the handcuffs. Drumgo alleges Stevenson used Drumgo's shirt to strangle him and that he punched Drumgo in the back of the head, while Drumgo was handcuffed. Drumgo alleges that Moss failed to intervene or stop the beating.

2

### 3.   Claim 5, Retaliation and Excessive Force against Kirlin and Corbett

Drumgo alleges that on August 4, 2014, Kirlin and Corbett forced him to remain in a bug-infested shower infested for 45 minutes in retaliation for a lawsuit he filed against Anthony Burris ("Burris"). Kirlin then read aloud the names of other officers from Drumgo's documents. Drumgo began kicking the shower door to get the attention of mental health, and Kirlin came to retrieve Drumgo from the shower. Drumgo alleges that he did not resist and that he put his hands behind his back. When he saw his cell in complete disarray he sat down Indian style, submissively, posing no threat. Drumgo alleges that Kirlin became agitated and yelled for Corbett to spray Drumgo. Corbett sprayed Drumgo while Kirlin kneed him in the cheek. Another correctional officer told Kirlin to stop. Drumgo was taken to isolation. Drumgo asked to shower because of the burning from the spray, but received no response.

### B.   Facts as Presented by the Parties

#### 1.   February 2014 Retaliation

On January 29, 2014, Drumgo was moved to the B-building. (D.I. 46, ex. A.) Drumgo complained that he had not received legal mail after the change in his housing assignment. (D.I. 47, Iwaskiewicz Decl.) Drumgo, who had seven boxes of legal documents, was informed that prison policy provides allows inmates only three storage boxes in their cell, and he had too many boxes. (D.I. 47, Iwaskiewicz Decl.; Little Decl. ) The amount of personal material an inmate is allowed is limited due to safety and security reasons. (*Id.* at Little Decl.) Little asked Martin to speak to Drumgo to obtain a forwarding address to send the excess legal materials. (D.I. 47, Martin Decl.) Foraker escorted Drumgo from A tier to B tier. (*Id.*) Martin was in the B Building security office with Iwaskiewicz, identified himself, and asked Drumgo for an address

3

so that Drumgo's property could be sent there. (*Id.*) Drumgo asked Martin if he had his property, and Martin told Drumgo that he did not. (*Id.*) Drumgo told Martin to send his property to the District Court. (*Id.*)

Martin states that none of Drumgo's property was present and that his only involvement with Drumgo's legal materials was to secure an address so that Drumgo's excess property could be sent there. (*Id.*) Martin states that he did not brandish Drumgo's legal materials, and he did not review Drumgo's legal materials. (*Id.*)

As is customary, Drumgo's personal property was inventoried upon his transfer. (*Id.* at Iwaskiewicz Decl.) Drumgo testified that he began "bugging the hell out of [the officers] about [his] property, because he had been without it for a month. (D.I. 46, ex. B at 12.) Drumgo testified that he was told by a worker in the property area that Little had his legal documents. (*Id.*) Little is the VCC Legal Services Administrator, but Drumgo knew Little as a law librarian. (D.I. 46, Ex. B at 13; D.I. 47 Little Decl. ). Drumgo submitted grievances, dated January 31, 2014 and February 2, 2014, complaining that he was being deprived of his legal documents and legal mail. (D.I. 51, ex. D.) The January 31 grievance states that Drumgo was "informed that [] Little is reading all [his] legal mail outside of his [presence]." (*Id.*) The February 2 grievance states that Drumgo was told that Little was seizing and reading Drumgo's documents in an attempt to find out what documents supported four cases that Drumgo claimed were currently open. (*Id.*) Inmates Christopher Johnson and Dwayne Staats provided statements regarding Drumgo's stress over his legal work. (*Id.* at exs. F, G.)

Iwaskiewicz worked on February 11, 2014, and distributed mail to inmates as part of his duties. (D.I. 47, Iwaskiewicz Decl.) Iwaskiewicz states that he does not review or check mail for

4

any reason. (*Id.*) Drumgo asked Iwaskiewicz about his legal mail, but the exchange only included Iwaskiewicz telling Drumgo he would speak to Little, nothing else. (*Id.*) Foraker worked the same shift that day and he did not read, review, or share Drumgo's mail with Iwaskiewicz or Martin. (*Id.*)

During his deposition, Drumgo stated that Iwaskiewicz and Foraker, said, "[o]h Mike Little is trying to teach you a lesson with you filing all these civil complaints and grievances . . . ." (D.I. 46, ex. B at 12, 14, 16.) Plaintiff did not remember if Martin said anything. (*Id.* at 15.) Drumgo testified that Little had testified against him "in previous dealings," so the last thing he wanted was for Little to review any of his documents. (*Id.* at 21.) Drumgo also testified that Iwaskiewicz, Foraker, and Martin were passing around his documents that had been copied, and that he described as "privileged lawyer envelopes and privileged lawyer letters." (*Id.* at 14-15.) Iwaskiewicz states that Martin did not pass around Drumgo's legal mail and Martin did not say that Little was trying to teach Drumgo a lesson. (D.I. 47, Iwaskiewicz Decl.)

Drumgo submitted a grievance on February 11, 2014, and stated that he had been told by Martin about the three box rule, that he thought the policy was unreasonable, asked for a reasonable alternative, and complained that he still had not received his legal documents. (D.I. 46, ex. E.) The grievances makes no mention of Iwaskiewicz, Foraker, or Martin passing around his documents.

Little met with Drumgo on February 18, 2014 to work out a plan for Drumgo to reduce the number of his boxes. (D.I. 47, Little Decl.) Drumgo was provided an area to go through all his legal materials and, after two and one-half hours, reduced his material to three boxes. (*Id.*) The remaining four boxes are stored in a property room at the VCC, although Drumgo requested

that they be sent to the United States District Court for the District of Delaware. (*Id.*) Little

states that he has not, and does not, read Drumgo's legal mail, and he does not make copies of

Drumgo's documents to send to the State. (*Id.*) At his deposition, Drumgo recalled that he and

Little were "together for a nice bit of time" when he went through his documents. (D.I. 46, ex. B

at 32- 33.)

### 2.    April 2014 Excessive Force and Failure to Intervene

On April 7, 2014, following an altercation with Foraker and Iwaskiewicz, Drumgo was

ordered to cuff up. (D.I. 46, Ex. F.) Drumgo was placed in the phone room and received a write

up for demonstrations, disorderly or threatening behavior, disrespect, and failure to obey an

order. (*Id.*) Later, Drumgo was transferred to the Security Housing Unit ("SHU") for

pre-hearing detention. (D.I. 46, ex. G.) Drumgo was being escorted to the infirmary for a

medical screening prior to placement in pre-hearing detention, but he refused to walk because he

had not been given his legal documents as he was allowed in the past pursuant to a memo written

by Major Costello. (D.I. 46, ex. B at 46-48; D.I. 47 at Stevenson Decl.) Drumgo sat down with

his hands behind his back and expected the officers to call a code, which would bring the Quick

Response Team ("QRT") to the scene. (*Id.* at 48.) Drumgo believed the officers would place

him on a food cart and roll him to the building. (*Id.*) Drumgo testified that he disobeyed the

orders in an effort to forgo the grievance process over the issue of his legal materials because he

believed the grievance process would be futile. (*Id.* at 48-49.)

The officers did not call a code. (*Id.* at 50.) Drumgo sat on the ground for about five

minutes while he refused to obey orders to walk to the infirmary. (*Id.* at 53.) Next, Stevenson

(the area supervisor for B Building) and Moss were called to assist in picking Drumgo (who

weighed about 204 lbs.) up from the floor and onto a haul cart. (D.I. 46, ex. B at 52-53, 56; exs.

G, H; D.I. 47 at Stevenson Decl.) Drumgo was "rolled" to the infirmary. (D.I. 47 at Stevenson

Decl.) At the infirmary, he was asked to walk because the cart was too wide to fit through the

door. (D.I. 46, ex. B at 56.) Drumgo refused. (D.I. 46, ex. B at 56.) Stevenson told the other

officers that Drumgo would have to be carried since he was refusing to walk. (D.I. 47 at

Stevenson Decl.) Stevenson and the remaining staff were forced to pick Drumgo up from the

floor. (D.I. 46, ex. G.)

Drumgo testified that he disobeyed direct orders to move, and officers dragged him by his

cuffs to the infirmary. (D.I. 46, ex. B at 56, 60.) According to the incident report, Drumgo

resisted as Moss and Stevenson picked him up by his arms. (D.I. 46, ex. G.) Drumgo shouted at

the officers, calling them racists and Klan supporters. (D.I. 46, ex. H.) Drumgo testified that

Stevenson used Drumgo's shirt to strangle him and that Stevenson punched Drumgo in the back

of the head during the trip.[2] (D.I. 46, ex. B at 59, 61.)

The incident report indicates that Moss lost control of Drumgo's arm. (D.I. 46, ex. G.)

Stevenson stated that when Moss lost control of Drumgo's right arm, he placed his arm up under

Drumgo's arm and placed his hand on his shoulder and assisted the rest of the way into the

infirmary. (D.I. 47 at Stevenson Decl.) Drumgo testified that Moss did not say anything during

the incident, and that he failed to intercede. (*Id.*)

As they entered the examination room, Drumgo attempted to drop to the ground. (D.I. 47

at Stevenson Decl.) Stevenson and another officer placed Drumgo on the examination table.

(*Id.*) Stevenson checked the handcuffs after Drumgo complained that his left wrist hurt, but the

---

[2]Drumgo testified that his shirt was never removed. (D.I. 46, ex. B at 61.)

cuffs were not too tight. (*Id.*) Drumgo was seen by a nurse at the infirmary. (D.I. 46, ex. B at

74-75.) Drumgo testified that he had no injuries and did not seek additional medical attention

from a nurse or doctor in connection with the incident. (*Id.*) After Drumgo asked to see mental

health because he was feeling suicidal, he was placed under watch in the psychiatric close

observation unit. (D.I. 46, ex. G; D.I. 47 at Stevenson Decl.)

### 3.    August 2014 Excessive Force and Retaliation

On August 4, 2014, at 10:00 a.m., there was a shakedown or random search of Drumgo's

cell. (D.I. 50.) Drumgo alleges that the search was in retaliation for a lawsuit he filed against

C/O Anthony Burris ("Burris") and that, during the search, he was forced to remain in a bug-

infested shower. (D.I. 3 at 4.) Corbett had no knowledge of any lawsuit Drumgo filed against

Burris. (D.I. 47 at Corbett Decl.) According to Corbett, she knew the showers were not bug-

infested, and she did not secure Drumgo in the shower during the search for a lengthy time-

frame. (D.I. 47 at Corbett Decl.) Nor did Drumgo tell the officers that the shower had bugs or

that he had concerns about waiting there while the search was conducted. (*Id.*)

During the search, Kirlin and Corbett heard Drumgo banging on the shower door. (D.I.

46 at Corbett Decl.) Kirlin and Corbett stepped out of Drumgo's cell and asked if everything was

okay and Drumgo screamed, "[expletive] you white supremacies [sic], this is retaliation for

grievances." (D.I. 46, ex. I; D.I. 47, Corbett Decl.) Kirlin and Corbett ordered Drumgo to stop

banging on the door, and then continued with the search of Drumgo's cell. (D.I. 47, Corbett

Decl.) This was Corbett's only communication with Drumgo that day. (*Id.*) Corbett states that

Kirlin did not read from Drumgo's documents. (D.I. 47 at Corbett Decl.)

At 10:10 a.m., Drumgo continued to kick the shower door and yelled, "get me the [expletive] out of the shower." (D.I. 50.) Drumgo was ordered to stop kicking. (*Id.*) Kirlin called other officers to inform them of the situation and asked that officers be sent for precautionary measures. (*Id.*) Drumgo was cuffed by Corporal Boromee ("Boromee") who had arrived at the SHU with Officer Postley ("Postley"). (*Id.*) Drumgo was escorted to his cell and when he reached the lower floor, he sat on the floor. (*Id.*) Drumgo was ordered to stand up and return to his cell, and he refused. (D.I. 46, ex. B at 99; D.I. 50.) Drumgo testified that, in an attempt to persuade him to go back into his cell, Kirlin told Drumgo that he would not write him up. (D.I. 46, Ex. B at 100.) Drumgo was ordered to roll onto his belly, and he refused. (D.I. 47, Corbett Decl.; D.I. 50.) When Drumgo began to clear his throat as if to spit, Corbett deployed a one second burst of her capstun to Drumgo's face.[3] (D.I. 47 at Corbett Decl.; D.I. 50.) Drumgo testified that Kirlin yelled at Corbett to spray him. (D.I. 46, ex. B at 101.) According to Corbett, Kirlin was standing next to her and not near Drumgo when she sprayed Drumgo. (D.I. 47 at Corbett Decl.)

Officers were informed that there was a passive resister and were asked to let the area lieutenant know that capstun had been used. (D.I. 50.) After he was sprayed, Drumgo stated that he had asthma and could not walk or breathe, although he continued to talk and, in the observation room, he was singing and talking. (D.I. 46, ex. B at 102; D.I. 50) Lieutenant Daum arrived and directed Kirlin and Boromee to carry Drumgo off the tier to the observation room for

---

[3]Drumgo testified that he called Corbett "everything in the book. I might have talked about her mom. I might have told her I was going to kill her whole family." (D.I. 47, ex. B at 103-104.) Drumgo also told Corbett that she was lucky that he only verbally assaulted her versus "doing something physical to her." (*Id.* at 104.)

medical assessment. (D.I. 50.)  Drumgo testified that as he was being dragged off the tier, Kirlin

started kneeing and hitting him in the face, that he was kneed in the left cheek, and that Boromee

told Kirlin to stop.  (D.I. 46, ex. B at 102, 110.)  Corbett states that Kirlin did not knee Drumgo

in the cheek.  (D.I. 47, Corbett Decl.)  Drumgo did not recall seeing a nurse or a doctor.  (D.I. 46,

ex. B at 110.)  Following a medical assessment with normal findings, Drumgo was escorted to

the SHU by the QRT.  (D.I. 50.)

Drumgo was charged and found guilty of:  (1) demonstrations; (2) creating health, safety,

or fire hazard; (3) disrespect; (4) failing to obey an order; (5) and off limits.  (D.I. 47, ex. L.)

Drumgo did not to appeal the decision.  (*Id.*)

## II.    STANDARD OF REVIEW

The court shall grant summary judgment only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine

issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 n.10 (1986).  When determining whether a genuine issue of material fact exists, the

court must view the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor.  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

If the moving party has demonstrated an absence of material fact, the nonmoving party then

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  However, a party

opposing summary judgment "must present more than just 'bare assertions, conclusory

allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The defendants move for summary judgment on the grounds that: (1) Drumgo suffered no adverse action or discipline in connection with his exercise of any constitutionally protected activity with regard to the retaliation claim against Foraker, Martin, Little, and Iwaskiewicz; (2) the conduct of Stevenson and Moss was proper and limited to the extent necessary to have Drumgo comply with an order; (3) Stevenson and Moss did not retaliate against Drumgo for filing lawsuits or grievances and merely sought to have Drumgo obey an order;[4] (4) Corbett and Kirlin use the force necessary and took action, not out of retaliation, but in response to Drumgo's repeated refusal to comply with officers' orders; and (5) the defendants have qualified immunity as to the claims asserted against them.

## III.   DISCUSSION

### A.   Retaliation

Drumgo raises two retaliation claims; one occurring in February 2014 and the other in August 2014. As to the February retaliation claim, Drumgo contends that summary judgment for the defendants is not appropriate because Foraker, Iwaskiewicz, Martin, and Little passed around his legal documents, read them, and told him that Little was trying to teach him a lesson for filing

---

[4]Drumgo did not raise a retaliation claim against Stevenson and Moss in claim three. He raised an excessive force claim and a failure to intervene claim.

11

grievances and lawsuits. As to the August 2014 retaliation claim, Drumgo contends that summary judgment for defendants is not appropriate because his cell was searched in retaliation for a lawsuit he filed against Burr, who is a friend and co-worker of Kirlin.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990). It has long been established that the First Amendment bars retaliation for protected speech. *See Crawford-El v. Britton*, 523 U.S. 574, 592 (1998); *Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981). Proof of a retaliation claim requires Drumgo to demonstrate that: (1) he engaged in protected activity; (2) he was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (citing *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Allah v. Seiverling*, 229 F.3d 220 (3d Cir. 2000) (a factfinder could conclude that retaliatory placement in administrative confinement would "deter a person of ordinary firmness from exercising his First Amendment rights" (citations omitted)). The causation element requires a plaintiff to prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997). "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological

interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).  When analyzing a retaliation claim, courts consider that the task of prison administrators and staff is difficult, and that the decisions of prison officials require deference, particularly where prison security is concerned.  *Rauser*, 241 F.3d at 334.

With regard to the February 2014 retaliation claim, the evidence of record indicates that Drumgo has filed lawsuits and submitted grievances, thus meeting the first prong of a retaliation claim.  His property was taken upon his transfer, thus meeting the second prong of a retaliation claim.  It appears from Drumgo's testimony that he was most concerned about the length of time that passed before his property was returned to him.  The record indicates it was approximately three weeks.

As to the third prong, the evidence of record does not support a finding that protected activity was a substantial or motivating factor in the taking of Drumgo's property.  Instead, the evidence of record is that, because the property in Drumgo's cell far exceeded that allowed under prison policy, it was taken for inventory and for Drumgo to determine what he wished to keep.  It is uncontroverted that prison policy limits the amount of personal material an inmate is allowed in his cell due to safety and security concerns.

To the extent Drumgo argues that Foraker, Iwaskiewicz, Martin, and Little passed around his legal documents, read them, or copied, they have submitted declarations denying those claims.  In addition, Drumgo provided conflicting testimony that, on the one hand Little had all of his legal documents, while on the other hand Foraker, Iwaskiewicz, and Martin had access to certain legal documents and were passing them around in such a manner that Drumgo was able to determine what they were, even though they were three to four feet away from him.  (D.I. 46, ex.

B at 14-15) Finally, the evidence of record does not support a finding that the actions taken by Foraker, Iwaskiewicz, and Martin were due to Drumgo's submitting grievances or filing grievances. Rather, when construing the evidence in the light most favorable to Drumgo, Foraker and Iwaskiewicz merely appeared to be taunting Drumgo by telling him that Little was trying to teach him a lesson. Notably, the acts taken by Foraker, Iwaskiewicz, Martin, and Little had no effect upon Drumgo. He continues to engage in protected activity.

Drumgo also asserts that Corbett and Kirlin retaliated against him in August 2014 as a result of a lawsuit he filed against Burris. It is unrefuted that Corbett had no knowledge of the lawsuit Drumgo filed against Burris. In his reply, Drumgo argues, without evidentiary support, that Kirlin was aware of the lawsuit because he is a co-worker and friend of Burris. However, there is nothing in the record to indicate that Kirlin had knowledge of the lawsuit. Also, Kirlin stated that the August 2014 search was completely random. Accordingly, although Drumgo has demonstrated that he engaged in protected activity and that he was subjected to an adverse action by reason of a search of his cell, the evidence of record does not lead to the conclusion that Drumgo's protected activity was a substantial motivating factor in the decision to search his cell.

No reasonable jury could find in Drumgo's favor. Therefore, the court will grant the defendants' motion for summary judgment as to the retaliation claims.

**B.     Excessive Force and Failure to Intervene**

Drumgo raises an April 2014 claim of excessive force claim against Stevenson; an April 2014 failure to intervene claim against Moss; and August 2014 excessive force claims against Corbett and Kirlin.

### 1.    Excessive Force

The Cruel and Unusual Punishments Clause of the Eighth Amendment protects inmates against the application of excessive force by correctional officers. *See Whitley v. Albers*, 475 U.S. 312, 318-19 (1986).  In an excessive force claim, the core judicial inquiry is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *See Wilkins v. Gaddy*, 559 U.S. 34 (2010).  Relevant factors relevant include:  (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (citations omitted).  The absence of serious injury is a relevant, but not dispositive, additional factor to be considered in the subjective analysis. *Id.*

The Eighth Amendment does not protect an inmate against an objectively de minimis use of force. *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002).  "There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." *Reyes v. Chinnici*, 54 F. App'x 44, 48-49 (3d Cir. 2002) (unpublished) (holding force was de minimis where corrections officer punched inmate in the shoulder to avoid being spit on). *Accord Thomas v. Ferguson*, 361 F. Supp. 2d 435, 439-41 (D.N.J. 2004) (finding that, "[e]ven if proven to be true and for no necessary purpose, Defendants' alleged conduct . . . does not meet the Constitutional standard for a claim of a malicious and sadistic use of force 'repugnant to the conscience of mankind,'" where inmate alleged he was punched and shoved by corrections

15

officers); *Wilson v. Reinhart*, 2003 WL 21756393 (D. Del. Jul. 29, 2003) (same where officer sprayed inmate in the face with mace).

Viewing the record in light of these factors, the court finds that Drumgo cannot prevail on his excessive force claims. In both instances, the defendants took action after Drumgo disobeyed or disregarded orders. With respect to the April 2014 incident, the parties provide slightly differing accounts. It is undisputed that Drumgo refused to walk to the infirmary because he had not been given his legal documents, and he admitted that he disobeyed orders of correctional staff. Drumgo testified that he expected the officers to call a code that, in turn, would bring the QRT who would be forced to pick up him up, place him on a cart, and roll him to the building. Stevenson and Moss placed Drumgo, who weighed in excess of 200 lbs. onto a cart and rolled Drumgo to the infirmary but, when they arrived at the infirmary, the cart would not fit through its door. Drumgo was again asked to walk and he refused to do so. At that point, Stevenson and other officers picked up Drumgo from the floor to move him into the infirmary, and Moss lost control of Drumgo's right arm. According to Stevenson, he placed his arm up under Drumgo's arm and placed his hand on his shoulder as they made their way into the infirmary. According to Drumgo, he was dragged by his cuffs, and Stevenson strangled Drumgo with Drumgo's shirt and punched Drumgo in the head. Drumgo was medically examined, he had no injuries, and Drumgo testified that he never sought any medical attention.

Similar to the April 2014 incident, the parties provide slightly differing accounts regarding the August 2014 incident. The undisputed evidence shows that Drumgo became disruptive while his cell was being searched, to the extent that he was banging on a shower door (where he was being held during the search) and yelling expletives. Drumgo was cuffed and

16

escorted to his cell, but when he reached the lower floor, he sat on the floor and, when ordered to ordered to stand up and return to his cell, he refused. When he was ordered to roll onto his belly, Drumgo refused. It was not until Drumgo began to clear his throat as if to spit, that a one-second burst of capstun was deployed to his face. After he was sprayed, Drumgo stated that he had asthma and could not walk or breathe, but he continued to talk and yell. He was then carried or dragged off the tier. Drumgo testified that he was kneed in the left cheek, but he did not recall seeing a nurse or a doctor. Incident reports indicate that he was medically assessed and all vitals were "fine and normal" and that he was "completely fine." There is no evidence of an injury to Drumgo's face.

The evidence indicates that, during both incidents, Drumgo was disruptive, disorderly, recalcitrant, and repeatedly refused to obey orders. After Drumgo refused to walk, the defendants were either forced to carry him, drag him, or place him on a cart to transport him. In both instances, Drumgo's complaints of maneuvers by correctional officers were not out of the ordinary in the context of controlling an inmate, particularly when physically moving an non-compliant individual who weighed over 200 lbs. In addition, there is nothing in the record to indicate that the decision to capstun Drumgo was anything but an attempt to keep order. Even construing the facts in the light most favorable to Drumgo, as the court must, the defendants' actions must be afforded substantial latitude relative to Drumgo's safety and that of the correctional officers. Here, the evidence of record fails to describe a use of force that is "repugnant to the conscience of mankind."

Finally, although it is not required that Drumgo show he suffered more than a de minimis injury to maintain his excessive force claim, *see Wilkins*, 559 U.S. at 39 (notion that significant

17

injury is a threshold requirement for stating an excessive force claim  rejected in *Hudson*, 503

U.S. at 7), the "absence of [a] serious injury" nevertheless remains relevant in an Eighth

Amendment inquiry. *Wilkins*, 559 U.S. at 40 (noting that the extent of injury may provide some

indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push

or shove' that causes no discernible injury almost certainly fails to state a valid excessive force

claim") (citing *Hudson*, 503 U.S. at 9 (internal quotations omitted).  Drumgo has failed to

produce any evidence showing a discernible injury.  Moreover, in the capstun incident, the

injuries of which he complains are nothing more than the normal after effects associated with the

use of capstun.[5]

Accordingly, the court finds that "the need for the application of force" was on account of

"the extent of the threat to the safety of staff and inmates" that Drumgo's conduct posed, and that

it was done in a good faith effort to maintain or restore discipline. *Brooks v. Kyler*, 204 F.3d

102, 106 (3d Cir.2000) (citation omitted).  A reasonable jury could not find that, based on the

circumstances, the force used in each instance was excessive.  Accordingly, the court will grant

the defendants' motion for summary judgment as to both excessive force claims.

### 2.    Failure to Intervene

Drumgo contends that during the April 2014 incident, Moss failed to intervene and

protect him from the actions of Stevenson as he was being carried to the infirmary.  During his

deposition Drumgo testified that Moss said nothing and he failed to intercede.

---

[5]The Third Circuit has found that use of pepper-spray to subdue an uncooperative inmate, after verbal attempts fail, does not rise to the level of excessive force. *Passmore v. Ianello*, 528 F. App'x 144, 148 (3d Cir. 2013) (unpublished).

18

The Eighth Amendment requires prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners, as well as at the hands of guards or other state actors. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, a corrections officer's failure to intervene in a beating can be the basis for liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and refused to do so. *Smith*, 293 F.3d at 650. For liability to attach under § 1983 for the failure to intervene in another's use of excessive force, a plaintiff must show that: (1) the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was a realistic and reasonable opportunity to intervene. *Id.* at 651.

As discussed above, the record does not support Drumgo's claim that excessive force was used against him during the April 2014 incident. In addition, the evidence of record does not support a finding that Drumgo sustained a serious injury. The Third Circuit has found that a plaintiff's failure to protect claim cannot proceed in the absence of a serious injury. *See Matthews v. Villella*, 381 F. App' x 137, 139 (3d Cir. 2010) (unpublished) (failure to protect claims dismissed upon a finding that the plaintiff's alleged injuries did not rise to the level of serious harm, and there were no allegations of a pervasive risk of harm from a single incident).

Nor does the evidence presented support a finding that Moss failed to intervene. Drumgo's testimony is merely that Moss did not say anything, followed by Drumgo's legal conclusion that Moss "failed to intercede." Finally, any injuries that Drumgo may have sustained during the incident do not objectively rise to the level of a serious harm as required to establish a constitutional violation. Moss cannot be held liable for failure to intervene and, therefore, the court will grant the defendants' motion for summary as to this claim.

## IV. CONCLUSION

For the above reasons, the court will grant the defendants' motion for summary

judgment.[6] (D.I. 45.)

An appropriate order will be entered.

_____
UNITED STATES DISTRICT JUDGE

_____, 2017
Wilmington, Delaware

---

[6]The court will not address the issue of qualified immunity given that summary judgment is appropriate on other grounds.